IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 19, 2025

## STATE OF TENNESSEE v. JONATHAN LOUIS NELSON

**Appeal from the Criminal Court for Washington County**
**No. 47561     Lisa Rice, Judge**

_____

### No. E2024-01217-CCA-R3-CD

_____

The Defendant, Jonathan Louis Nelson, was convicted by a Washington County Criminal Court jury of aggravated kidnapping, rape, three counts of aggravated rape, and aggravated assault, and was sentenced by the trial court to an effective term of forty years at 100% in the Tennessee Department of Correction.  On appeal, the Defendant challenges the sufficiency of the evidence in support of his aggravated kidnapping and rape convictions and argues that the trial court erred in declining his request for a special jury instruction on the lack of consent as an essential element of aggravated rape.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Jessica F. Butler, Assistant Public Defender-Appellate Division, Franklin, Tennessee (on appeal); and William C. Donaldson and Elizabeth Jones, Assistant District Public Defenders, Jonesborough, Tennessee (at trial), for the appellant, Jonathan Louis Nelson.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Steven R. Finney, District Attorney General; and Robin Ray and Abby V. Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case arises out of the Defendant's actions on February 29-March 1, 2020, toward his ex-girlfriend in a Johnson City hotel room. According to the State's proof at trial, the Defendant held the victim in the hotel room against her will and repeatedly raped, beat, and strangled her throughout the night and into the next morning. As the Defendant, the victim, and their two young sons were leaving the hotel in the victim's van the next morning, the victim intentionally crashed the van into the swimming pool gate, ran into the hotel lobby, and asked bystanders for help. The Defendant fled the scene after depositing the two children inside the hotel lobby. The Washington County Grand Jury subsequently indicted the Defendant for aggravated kidnapping, rape, three counts of aggravated rape, and assault by strangulation.

The State presented seven witnesses at the September 2023 trial, which included a chain-of-custody witness and a Tennessee Bureau of Investigation forensic scientist. Neither of those two witnesses provided relevant testimony to the issues raised on appeal, other than the forensic scientist's testimony that sperm from the victim's vaginal swab matched the Defendant's DNA profile.

The State's primary witness was the thirty-two-year-old victim, who testified that the Defendant was her ex-boyfriend and the father of her two sons: Ryder, who was six, and Ethan, who was five. She said that she and the Defendant began a tumultuous romantic relationship in 2015, with periods of breakups and periods of reconciliation until their final breakup in December 2019. Their son Ryder was born in December 2016, and their son Ethan was born in July 2018. After their final breakup, she and the Defendant were in "a friendly co-parenting relationship" that included "a few times" in which they were sexually intimate. There were other times that the Defendant wanted to have sexual intercourse, but they did not because the victim told the Defendant no.

The victim testified that on February 29, 2020, she took the two children, who were then one and three, for a visit with their family at the Defendant's parents' home. While she was there, the Defendant called her on the phone to ask that she bring him his envelope of cash. She agreed, driving in her van with her children to Bristol, where she met the Defendant behind a house. The Defendant got into the passenger seat of the van, and they had a general conversation that progressed into the Defendant's expressing his desire to spend more time with the victim and their children. The Defendant suggested that he come home with the victim to spend the night, but she told him that she did not want him to. She told the Defendant that it was late, that she and the children were going to church the next morning, and that she wanted to get the children to bed.

The victim testified that the Defendant was persistent and became increasingly annoyed as she repeatedly told him no. Eventually, she began driving the Defendant toward Johnson City with a stop along the way for gasoline. The Defendant got out of the van to pump the gasoline and gave her the van's keys back when he returned from paying. During the drive to Johnson City, the Defendant was going through the victim's cell phone, "raising his voice" and becoming "more aggressive" as he asked the victim about conversations on her cell phone.

The victim testified that the Defendant directed her to a Comfort Inn Suites in Johnson City, where the Defendant had been staying on a somewhat regular basis. She said she wanted to drop the Defendant off and go home, but the Defendant wanted her to spend the night with him at the hotel. When she refused, the Defendant got out of the van with her keys and her cell phone, told her that she was not "going to take off on him," and went into the hotel to book a room. The victim said that she was upset but did not want to cause a scene in front of her children.

The victim testified that the Defendant returned a few minutes later, removed one of the children from the van, and told the victim that she was spending the night with him. Because she had already told the Defendant at least ten different times that she did not want to spend the night with him, she remained quiet, picked up their second child, and followed the Defendant and her other child to the hotel room. The victim explained her thought process was that if she did not argue, she and the children would be able to leave early in the morning. She said she did not leave at that time because the Defendant still had her keys and her cell phone and, even if he did not, she would have had "to carry [both children] and get out and get away."

The victim testified that the hotel room had a bed and a pullout couch bed. She said that Ryder was on the pullout couch bed while she lay on her side on the other bed nursing Ethan. After Ethan fell asleep, the Defendant lay behind her, rubbed her hip and thigh, and began pulling at her. The Defendant said, "Come on," indicating that he wanted to have sexual intercourse. She told him that she did not want to and pointed out that Ethan was right there. The Defendant responded that they were going to and that she did not have a choice. She placed Ethan on the pullout couch bed, and the Defendant began removing her clothes and kissing her all over her body. The Defendant then put his finger inside her vagina, followed by his penis. She did not want to have sexual intercourse with the Defendant, but she did not say anything during the intercourse. After the Defendant ejaculated inside her, she and the Defendant both got up.

The victim testified that she had dressed and was lying down again on the bed nursing Ethan when the Defendant lay back down in the same spot behind her. She was beginning to fall asleep and thought the Defendant was too, until he began "mumbling to

himself." She could not understand everything but heard him say something about finding out that she had been lying. The Defendant got louder and began directing his words at her. She told him to go to sleep, and he became angry, sat up, and got out of bed. She sat up holding Ethan, and the Defendant walked to her side of the bed and hit her with his closed fist on the right side of her head. She laid Ethan down on the bed so that he would not be hit, and the Defendant hit her again with his closed fist, striking her first on her temple, and then on her head. The blow to her temple made her "see black for a second," and the combined blows caused her to "feel [her] head kind of spinning" and "pounding."

The victim testified that the Defendant told her that he was going to hit her every time she told him something that he did not want to hear. The Defendant was yelling and becoming angrier as he repeatedly punched her in the head and then punched her hard in the stomach. The blow to her stomach knocked her breath out of her, and the Defendant said, "Yeah, that hurts, doesn't it." As the beating continued, the Defendant had the victim "going back and forth across the room" as he repeatedly punched and grabbed her. The Defendant also choked her and put his hands over her nose and mouth so that she was unable to breathe, causing the blood to rush to her head and her head to feel as if it were "going to pop." At one point, she tried to escape by running to the hotel room door. The Defendant ran after her, grabbed her by a fistful of her hair, pushed her back, and began hitting her again.

The victim testified that when she tried to scream, the Defendant put his hand over her mouth again. The Defendant next threw her onto the bed, said that he was going to rape her, removed only her pants, and put his fingers inside her vagina in a "really aggressive" manner. She "tried to fight more that time" and told the Defendant that it hurt. The Defendant did not "have much response except . . . to continue to just move [her] body around." The Defendant pulled her legs apart, put his penis insider her vagina, "pushing . . . harder" than the last time, and began having sexual intercourse with her. She cried out in pain, but the Defendant continued. The Defendant then moved her to the other side of the bed, stood behind and over her as she lay on her back, held her head in a tight grip so that she was unable to move, and pushed his penis into her mouth and down her throat "as hard as he could." She could not tell him it hurt because she was choking. "After a little bit," the Defendant said, "I'm going to come on your pretty face," and ejaculated on her face.

The victim testified that when the Defendant was finished, she put her clothes back on and that she and the Defendant sat on the bed. The Defendant talked for a little while, acting "almost normal" but still appearing paranoid. Meanwhile, the victim was in pain and in shock. She described her injuries: "[My body] was sore all over. [Indiscernible] my head hurt pretty bad. My body was sore, and my legs. And then my mouth hurt really bad 'cause I had, like, kind of, like, cut my teeth into my lips."

The victim testified that the Defendant eventually became angry again and resumed hitting her. At one point, the Defendant squeezed and twisted her leg as he said that he was going to break her leg. At another point, the Defendant picked her up from the floor by yanking hard on her hair. When he did so, the victim experienced a "burning feeling" as the Defendant "ripp[ed] the scalp from [her] skull." Her head was bleeding badly, and the Defendant told her that she was making a mess, took her to the bathroom, and made her wash her face and hair in "super cold water."

The victim testified that the Defendant followed her from the bathroom into the room. Ethan awoke and was upset, and the Defendant told her to calm him down. The Defendant was still angry and began hitting her as she was holding Ethan. She started toward the door carrying Ethan, and the Defendant chased her and pushed her so that she fell on the bed on top of Ethan. She left Ethan on the bed as the Defendant continued to hit her. The Defendant at one point threatened to kill her. At another point, he pushed her on the bed, pulled her pants down, and "put his finger into [her] butt." She felt as if she were being cut and told the Defendant that it "hurts so bad" and to stop. The Defendant did not stop, but instead told her, "Good, bitch. It's supposed to hurt."

The victim testified that the Defendant continued to make accusations against her as he beat her. She said she eventually noticed that it was getting light outside and began trying to convince the Defendant that they should leave before housekeeping arrived. The Defendant told her not to do anything stupid and made her shower with him to clean herself off. As she was gathering her belongings from the room, the Defendant hit her in the head again, and she called out hoping someone would hear her, despite the Defendant's having threatened to kill her if she yelled. The Defendant responded by putting his hand over her nose and mouth again, preventing her from breathing and causing her to weaken and slump to the floor. During that time, Ethan, who had been following her around the room, was crying and saying, "Momma, Momma." Unable to talk, and believing that she was about to die, she told Ethan that she loved him by making an "I love you" hand gesture that she and Ethan used with each other.

The victim testified that she passed out. She did not know how long she was unconscious, but the next thing she remembered was being in the bathroom, trying to clean herself up, and searching for her pants. She stated that the Defendant followed her into the bathroom and hit her on the back of the head. Ethan was standing at the bathroom door crying, and Ryder was on the bed crying. The Defendant finally told her, "Yeah, let's . . . leave. Let's go. Don't try anything stupid or I'll just kill you. I'll just go ahead and kill you." The victim testified that she still did not have her keys or her cell phone. She said that the Defendant picked up Ryder, she picked up Ethan, and they left through a side door that bypassed the lobby. When they reached her van, the Defendant told her that she was going to drive him wherever he wanted to go that day.

The victim testified that she thought the Defendant would kill her somewhere if she left with him. She said that she and the Defendant put the children in their car seats and that she drove the van to the front of the hotel lobby, where the Defendant took the van keys with him as he went inside to check out of the hotel. She stated that she tried to leave the van to get help, but the Defendant returned before she could get away. The Defendant initially refused to give her the van's keys until she threatened to make a scene. The Defendant finally relinquished his hold, and she quickly picked up the keys and started the van. Almost as soon as she started the van, however, the Defendant was at the passenger side and jumping into the passenger seat. At that point, she panicked and drove the van into the pool gate.

The victim testified that she opened the driver's door, ran into the hotel lobby, and yelled, "Somebody get my kids. He's trying to kill me. I crashed the van. My kids are out there. My kids." "[T]he whole room was spinning and [her] legs were shaking." Some people helped her sit down, and one man went outside toward the van. The next thing she knew, the Defendant was coming inside the lobby with the children, followed by the man. The Defendant walked up to her, dropped the children in her lap, said that she would never see him again, and ran out of the hotel lobby.

The victim testified that she was transported by ambulance to the hospital. She said her head was badly bleeding, her face was swollen, and she could only open her mouth halfway. She was diagnosed with a concussion, had staples placed to close the laceration in her scalp, and had cuts, bruises, and swelling on her face, head, and legs. Among other photographs admitted as exhibits were photographs of the bloody hotel room and of the victim's injuries, including: bruises on her legs, stomach, buttocks, back, neck, and arms; a cut to her foot; the laceration to her scalp; burst blood vessels in her eyes; a cut on her nose that she said was caused when the Defendant knocked her eyeglasses off her face; and cuts around her mouth. The victim testified that the cuts to her mouth were caused by the Defendant's thrusting of his penis into her mouth: "Whenever [the Defendant] would put his penis in my mouth, it was really forcefully. And it made me bite my lips every time."

On cross-examination, the victim acknowledged that, after their final breakup, she and the Defendant saw each other at least once a week and had consensual sexual encounters "[a] few times." She acknowledged that she followed the Defendant through the hotel lobby without saying anything to the desk clerk, that the Defendant did not have a weapon, and that the Defendant did not physically force her into the hotel room. She further acknowledged having said that the Defendant did not use force or violence in the first episode of penile-vaginal intercourse and that she complied with the encounter.

The victim acknowledged that the Defendant was a smoker and said she thought the Defendant might have gone outside at some point to smoke. She said she was too nervous

to attempt to leave, that the Defendant would have been right outside, and that she still had her two children with her in the room. She acknowledged that she did not try to call the front desk or 911 or to lock the Defendant out of the room.

On redirect examination, the victim testified that she still loved the Defendant after their final breakup but no longer desired to be in a romantic relationship with him. She stated that when the Defendant first said that he wanted to have sexual intercourse with her, she told him, "Not right now. No." Asked what she said when the Defendant began "rubbing on" her, she replied: "I told him to stop. I did not feel like it. And Ethan was right there. And I just - - I just didn't want to. And I pushed - - just kind of, like, gestured for him to move away." She said she complied with the first episode of penile-vaginal intercourse because she felt she had no choice.

Officer Tyler Whitlock of the Johnson City Police Department ("JCPD") testified that he was dispatched to the hotel on March 1, 2020, on a private property collision call. He arrived within minutes of the call to find an unoccupied white van with airbags deployed crashed into the pool fence and the victim inside the hotel lobby with her two children. The victim "appeared distressed yet quietly somber, as if she had been through a traumatic event." He observed dried blood around the victim's mouth, bruising on her face, and that her hair was matted with blood. The injuries did not appear to him to have been caused by the impact of an air bag, and the victim told him that she had been assaulted and sexually assaulted by the Defendant. On cross-examination, Officer Whitlock acknowledged he was not an expert in traffic accidents.

JCPD Captain Mike Adams of the Criminal Investigations Division ("CID"), who processed the hotel room on March 1, 2020, testified that he found "a large clump of hair" on the floor beside the bed, a pair of eyeglasses with blood on them, blood on a comforter on one of the beds, and blood on a window curtain.

Debbie Dunn of the Family Justice Center, formerly an investigator with the JCPD CID and the on-call investigator on March 1, 2020, described the victim's demeanor when she met her at the hospital trauma center as "broken." She said the victim was not crying hysterically but appeared "calm and just kind of sad." She stated that she at times had difficulty understanding the victim as she took her statement because the victim "could barely open her mouth to speak." She identified the photographs she took of the victim's injuries and said that the case was a particularly "tough one" for her due to the extent of the victim's injuries and the fact that the victim's two children were in the hotel room with the victim.

On cross-examination, Investigator Dunn acknowledged that she did not see what happened in the hotel room and that she was relying on the victim's statement about what

transpired. She further acknowledged that the search warrant she swore out listed charges of aggravated kidnapping, aggravated assault, and aggravated rape, with three marked as the number of counts of rape. On redirect examination, she testified that the statement the victim gave her on March 1, 2020, included the information that the victim had not consented to the first sexual encounter in which the Defendant penetrated the victim's vagina with his penis.

Dawn Smith, the sexual assault nurse examiner who performed the rape kit on the victim, testified that the victim was initially flat in her affect, which was normal for victims of sexual assault. However, when they got to the "patient narrative," the victim "bec[a]me very upset, very tearful" and "nauseous" as she related what had happened, and they twice had to stop the narrative because the victim was dry heaving. Using photographs and a diagram to illustrate her testimony, Nurse Smith described in extensive detail the victim's numerous injuries, including: the multiple bruises and swelling on the victim's body; the laceration on her head; the cuts on her mouth; the petechial hemorrhages in the sclera of her eyes, on her face, and on her neck; and the genital injuries. Of the latter, Nurse Smith testified that "literally the entire area . . . was red" from the labia majora to the cervix at the very back of the vaginal canal, with "significant redness" of "the cervix as well as the vaginal walls." The redness to the cervix was not common; she had seen that type of redness to the cervix in only approximately 2% of the 185 sexual assault examinations she had performed.

Nurse Smith testified that she documented the information the victim provided on a forensic flow sheet. She stated that she erroneously marked "no" under the section that asked if the victim had urinated. She recalled that the victim had attempted to provide a urine sample without success and that the victim told her she was having difficulty urinating. However, "if [the victim] tried and got some out, that would have been something [Nurse Smith] should have documented 'yes' to." Consistent with the victim's report of difficulty urinating, Nurse Smith noted on the physical examination that the victim had redness to the periurethral tissue, "which is the area where urine comes out."

Nurse Smith testified that she initially checked "no" to anal penetration but then went back and changed the answer to "yes," writing "digital" with an arrow pointing to the anal penetration line of the form. She explained that it was "very common in trauma" for a victim to initially answer "no" to a yes or no question but then to recall details as the physical examination proceeded. She said she checked yes on the form for vaginal penetration and penetration of the mouth. She testified that "[t]he items that [the victim] mentioned . . . during her narrative were hitting, pushing, slapping, strangulation and hair-pulling."

- 8 -

On cross-examination, Nurse Smith testified that she checked "forearm chokehold" under the strangulation assessment of her report and "no" as to whether the victim was unconscious during the strangulation.

The thirty-four-year-old Defendant testified that the victim was initially hesitant when he suggested that they spend the night together but eventually agreed, with their initial plan being for him to spend the night at her Jonesborough apartment. He said the victim left the van running when they stopped for gasoline in Bristol and that he pumped and paid for the gasoline. They came across the Comfort Inn Suites as they were headed toward the victim's apartment, and he suggested they spend the night there instead. The victim told him she did not care if they stayed at the hotel, but she had a headache and did not have any diapers for the children. He told her he would get her some headache powders and something to drink from a nearby service station and would go to Walmart to buy diapers and diaper wipes. The victim's "only objection" to spending the night at the hotel was her headache and the lack of diapers, and when he offered the above solutions, the victim "was okay with it."

The Defendant testified that the victim drove to the service station, where he went inside and bought a package of headache powders and a Snapple before returning to the van and getting back into the passenger seat. The victim drove to the hotel and parked, and he went inside to book a room. The victim had her cell phone and the van keys with her during that time. After he booked the room, he went back outside, and he and the victim, each carrying a child, walked through the hotel lobby and past the desk clerk to their hotel room.

The Defendant testified that they checked into the room at approximately 9:30 p.m. When they first arrived, he and the victim were "hanging out" and talking. The victim said nothing about not wanting to be there. He left the room for about five minutes to buy snacks from the hotel vending machine. When he returned at approximately 10:00 p.m., he prepared the pullout couch bed for the children, and he and the victim had another discussion about their need for diapers. He then walked to Walmart, where he purchased pizza rolls, Styrofoam plates, diapers, and wipes. Before he left, he suggested that the victim close the clasp security lock on the interior of the door. He did not take the victim's van keys with him, and the victim had the interior security lock engaged when he returned to the room twenty or thirty minutes later. He knocked, and the victim let him back into the room.

The Defendant testified that the boys were playing while he and the victim talked. As the conversation continued, the topic of his giving the victim a massage came up. The victim was agreeable, and he massaged the victim's back, buttocks, and legs. There was a knee wall that separated the king-size bed from the pullout couch bed, and he got up to

place a chair as a barrier to prevent the boys from coming over. He then asked if he could remove the victim's pants, and the victim said yes. He continued to massage the victim and began kissing her all over her body. He could not remember what the victim said but testified that she "wasn't opposed to what was happening."

The Defendant testified that he then asked the victim if he could give her oral sex, and she said yes. The cunnilingus eventually evolved into their having "vaginal intercourse," which started with him on top and progressed to the victim on top. During the midst of their penile-vaginal intercourse and while the victim was on top, the victim looked down at him, asked if he was okay, and told him that his face appeared to be "drooping a little bit." He told her to get off him, got up, looked in the mirror, and saw that his face appeared fine. At that point, he asked the victim "to finish [him] off. And so she did, and that was orally."

The Defendant testified that his telling the victim that he was "going to come on her pretty face" was "something typical" for him to say and that he was "pretty sure [he] did say that." However, he ejaculated "[m]ore . . . on her chest." There was never a time during their sexual encounter that the victim told him to stop. When the intercourse was completed, he and the victim got up, cleaned off, and dressed. He settled the boys down and went outside to smoke. He did not have the victim's van keys or cell phone with him. During the time that he was outside, he texted the victim to tell her that he loved her, and he was pretty sure that the victim texted back that she loved him too.

The Defendant testified that he was gone for at least ten minutes. The hotel room had a telephone, and the victim also had her cell phone with her during that time. He returned to the room at 12:40 or 12:45 a.m. The victim began nursing Ethan as she lay on the king-size bed, and he had Ryder beside him on the same bed watching television. When the boys fell asleep, he and the victim put them in the pullout couch bed, and he and the victim went to sleep in the king-size bed.

The Defendant testified that he awoke the next morning to the sound of Ethan fussing and the sight of the victim nursing Ethan in the king-size bed. He said he and the victim began "having a conversation about some accusations that [he] was making against [the victim], suspicions that [he] was having." The conversation turned into an argument, and he told the victim that she needed to tell him the truth. When she did so, he hit her in the mouth with the back of his hand. Afterward, he and the victim continued to argue, and he continued to hit her.

The Defendant testified that the third time he hit the victim, she screamed. It was early in the morning as hotel guests were starting to awaken, and he covered the victim's mouth with his hand so that no one would hear. However, he made sure not to cover her

nose and said to her, "Tiffany, I just don't want you screaming. You can breathe." When he got off the victim, he and the victim renewed their argument, he started hitting the victim again, and the victim began fighting back. He could not recall hitting the victim's body and thought that her body bruises likely came from their "wrestling around . . . [o]n the floor." He recalled that the victim scratched his neck and bit him and said that they were each pulling the other's hair.

The Defendant testified that he thought the victim had been logging into his email and Facebook accounts. He said he had his cell phone in his hand as he asked the victim to show him how she was doing that. When the victim told him that she did not know what he was talking about, he hit her hard in the head with the cell phone. He thought that the blow to her head with his cell phone was what caused the laceration to the victim's scalp. He said the victim screamed for the second time when he hit her in the head with the cell phone and that he again placed his hand over her mouth, leaving her nose uncovered, as he took her to the floor and said, "You can breathe. I'm not covering up your nose, but I just don't want you screaming."

The Defendant testified that the cell phone blow to the victim's head was the last time he hit her. He explained that the sight of the victim's blood "kind of snapped [him] out of it" and made him realize that he "need[ed] to stop." He stated that the victim got up and that he told her to go to the shower to clean up. He said he went into the bathroom to assist and suggested that she use cold water to help stop the bleeding. Ethan awoke, was upset that the victim was not there, and walked to the bathroom saying, "Momma, Momma." The Defendant testified that when the victim emerged from the shower, he attempted to check her head to see if the bleeding had stopped, but the victim was focused on leaving. The Defendant testified: "And, you know, it would make sense that now she's trying to leave. Now she's trying to get away. Now she - - you know, she wants to get away from me at this point."

The Defendant testified that he and the victim and their children left the hotel room by a side door and got into the van. The victim pulled up outside the lobby, and he asked for the van keys because he was afraid that the victim would leave him stranded. As he was inside the lobby waiting for the desk clerk, he looked outside, saw that the victim was getting out of the van, went back outside, and pushed the victim back into the van. He then leaned into the van and inserted the key into the ignition so that he could lower the windows. He backed out of the van, and the victim shut the driver's door. He ran around and jumped into the passenger seat at about the same time that the victim started the engine. The victim then "stomped the gas" and drove into the pool gate. The victim exited the van and ran into the hotel lobby, and he followed with the children but quickly left because he knew that the police would be called. The Defendant acknowledged that he badly beat the

victim but denied that he kidnapped or raped her and said that he was profoundly remorseful for his actions.

On cross-examination, the Defendant acknowledged that he was 6'1" tall but disagreed that he weighed 240 pounds at the time of the incident, testifying that he was "about 200 at the time." He acknowledged his suspicions about the victim existed at the time he initiated their sexual encounter but said it was "not something [he] was consciously thinking about in that moment." He further acknowledged that the children were awake when he and the victim had sexual intercourse but testified that they were asleep throughout the duration of his assault of the victim. He testified that his sexual intercourse with the victim "may have got a little rough" but denied that he forced the victim to have sexual intercourse with him.

Following deliberations, the jury convicted the Defendant of all counts as charged in the indictment, and the trial court subsequently sentenced him to an effective term of forty years at 100% in the Tennessee Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the Defendant challenges the sufficiency of the evidence in support of his aggravated kidnapping and rape convictions. With respect to the aggravated kidnapping conviction, the Defendant argues that the State failed to prove that he substantially interfered with the victim's liberty, or, alternatively, that his confinement of the victim was not incidental to the other offenses. With respect to his rape conviction, the Defendant argues that the State failed to prove beyond a reasonable doubt that his sexual activity with the victim was nonconsensual. The State responds that "the evidence overwhelmingly establishes the essential elements of each offense beyond a reasonable doubt." We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

- 12 -

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

## A. Aggravated Kidnapping Conviction

To sustain the conviction for aggravated kidnapping, the State had to prove beyond a reasonable doubt that the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with the victim's liberty and that the victim suffered bodily injury. *See* Tenn. Code Ann. §§ 39-13-302 (a), -304(a)(4). Confinement is unlawful when it "is accomplished by force, threat, or fraud." *Id.* at § 39-13-301(15).

The Defendant first argues that the evidence failed to show that he substantially interfered with the victim's liberty. In support, he cites his own testimony about the multiple times he left the hotel room as well as the victim's testimony that the Defendant did not physically force her into the room, that the Defendant may have left the room at one point to smoke, and that the victim did not call for help or attempt to lock the Defendant out of the room. However, viewed in the light most favorable to the State, the evidence establishes that the Defendant, knowing that the victim did not want to spend the night with him, first coerced the victim into accompanying him to the hotel room by taking the victim's van keys and cell phone and removing one of their children from the van, and then kept her confined in the hotel room throughout the night and into the next morning by threats and repeated acts of physical violence. These acts of violence included chasing the victim to the door when she attempted to flee and covering her nose and mouth when she screamed and attempted to call for help.

Alternatively, the Defendant, citing *State v. White*, 362 S.W.3d 559 (Tenn. 2012), argues that the State failed to prove that his confinement of the victim was not incidental to the other offenses. The *White* Court held that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the underlying felony." *Id.* at 578. To that end, the *White* Court provided a jury instruction on the "substantial interference" element of kidnapping that contains a non-exclusive list of factors for a jury to consider, including: whether the removal or confinement occurred during the commission of a separate offense; whether the interference with the victim's liberty was inherent in the nature of the separate offense; whether the removal or confinement prevented the victim from summoning assistance; whether the removal or confinement reduced the defendant's risk of detection; and whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. *Id.* at 580.

The Defendant asserts that his confinement of the victim "took place prior to the other charged offenses, indicating that it was incidental to those offenses rather than a separate offense." He then argues that the charged offenses were "so intertwined" that, even when viewed in the light most favorable to the State, any confinement of the victim was "part and parcel" of the other crimes for which he was convicted.

We disagree. Viewed in the light most favorable to the State, the evidence establishes that the Defendant not only coerced the victim into accompanying him to the hotel room and kept her confined there by verbal threats and physical violence, but also that he prevented her from summoning help by pulling her away from the door and strangling her. The Defendant, additionally, continued to keep the victim under his control after they left the hotel room. The Defendant's substantial interference with the victim's liberty occurred before, during, and after the commission of the rape, the aggravated rapes, and the assault by strangulation, and it far exceeded that which was necessary to commit those other offenses. We, therefore, affirm the Defendant's aggravated kidnapping conviction.

## B. Rape Conviction

The Defendant's rape conviction was based on the first episode of sexual intercourse in the hotel room. To sustain the conviction, the State had to prove beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim, and the Defendant knew or had reason to know at the time of the penetration that the victim did not consent. *See* Tenn. Code Ann. § 39-13-503(a)(2). The Defendant cites his version of the sexual encounter, along with the victim's testimony about the on-going sexual nature of their relationship and the victim's failure to physically resist the Defendant's advances, to argue

- 14 -

that the proof was insufficient for the jury to convict him of rape in this "classic example of a he-said, she-said event."

However, viewed in the light most favorable to the State, the evidence establishes that the victim did not consent to the sexual intercourse, and that she made her lack of consent clear to the Defendant. The victim's testimony was that she told the Defendant "[n]o" and that she was not in the mood for sexual intercourse at that time, pointed out that their younger son was in bed beside her, and gestured for the Defendant to move away. "Consent is a question for the jury." *Haynes v. State*, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976) (citation omitted). By convicting the Defendant of rape, the jury obviously accredited the victim's testimony, as was its prerogative as the trier of fact. We, therefore, affirm the Defendant's rape conviction.

## II. Special Jury Instruction on Aggravated Rape

The Defendant next contends that the trial court erred in denying his request for a special jury instruction on the lack of consent as an essential element of aggravated rape. The trial court issued the pattern jury instruction for each count of aggravated rape, which, in addition to including the alleged type of penetration the State was required to prove for each count, instructed the jury that, in order for it to find the Defendant guilty of the offense, the State had to prove beyond a reasonable doubt that the Defendant had unlawful sexual penetration of the alleged victim, that the Defendant caused bodily injury to the alleged victim, and that the Defendant acted either intentionally, knowingly, or recklessly. *See* T.P.I. – Crim. 10.01 (28th ed.)

The Defendant argues that the trial court's reliance on the pattern jury instruction that does not define "unlawful sexual penetration" and "omit[s] any instruction regarding consent," "undoubtedly misled the jury by providing an incomplete and ultimately confusing explanation of the elements of the offense." The Defendant acknowledges that this court, in *State v. Tolliver*, No. W2021-01386-CCA-R3-CD, 2023 WL 2673152, at *15 (Tenn. Crim. App. Mar. 29, 2023), noted that "unlawful," while undefined in the statute, is defined in *Black's Law Dictionary* as "'[n]ot authorized by law; illegal'" and "'[c]riminally punishable.'" *Id.* (quoting *Black's Law Dictionary* (11ᵗʰ ed. 2019)). The Defendant argues, however, that the issue is not whether "unlawful" carries a meaning different from the common understanding of the word but rather, whether "the common understanding of that term fails to fully capture the fact that a finding of unlawful sexual penetration also requires a finding that the defendant lacked consent." In his reply brief, the Defendant argues that the bodily injury element under which he was convicted of aggravated rape is the only one of the several different circumstances under which a defendant may be convicted of rape or aggravated rape in which the concept of consent is not inherent. The Defendant argues that his proposed special jury instruction "is even more

- 15 -

necessary where, as here, the defendant was also charged with rape and the discrepancies between the two instructions results in the jury being misled as to the elements of the offense and the proof the State must present to secure a conviction." The State argues that "the victim's [lack of] consent is not an essential element of aggravated rape, and the trial court's instruction gave a full and fair description of the law." We, again, agree with the State.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). Thus, a trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001).

The Defendant's proposed jury instruction reads in pertinent part:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had unlawful sexual penetration of the alleged victim, or the alleged victim had unlawful sexual penetration of the defendant;

**and**

(2)(a) that force or coercion was used to accomplish the act;

**or**

(b) that the sexual penetration was accomplished without the consent of the alleged victim and the defendant knew, or had reason to know, at the time of the penetration that the alleged victim did not consent;

**and**

(3) that the defendant caused bodily injury to the alleged victim;

**and**

(4) that the defendant acted either intentionally, knowingly, or recklessly.

The trial court denied the request by written order entered on September 5, 2023, and again orally at trial, finding that the pattern jury instruction was adequate and provided a correct statement of the law.

We conclude that the trial court properly declined to issue the proposed special jury instruction. The victim's lack of consent is not an essential element of aggravated rape, and we disagree that the pattern jury instruction in any way misled or confused the jury as to the applicable law. The Defendant is not entitled to relief on this issue.

## <u>CONCLUSION</u>

Based on our review, we affirm the judgments of the trial court.

s/John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE
